May it please the Court, Elisa Klein for the United States. Thank you Your Honor. Just focus on some of the particular errors in Judge Wheeler's analysis here, in some ways build upon what was being said before. There's no clear statement requirement as the insurers are using that term. When you're looking at appropriations legislation, as in Highland Falls and Dickerson and Will, the only question is a fair inference about Congress's intent. And if you look at the way this Court in Highland Falls looked at the appropriations legislation and the Supreme Court in the prior cases, they looked at, you know, didn't require any magic words, looked in context at what Congress was doing and concluded in each of those cases that the legislation capped payments. Well there is a standard that I think has come out, at least the early Supreme Court cases, is expressly or by clear implication. Yes, and by clear implication we can see from the mode of analysis used by the Supreme Court in Dickerson and Will, means we're going to look at the legislative history, we're going to look at what had just happened before. So for example in both Dickerson and Will, the Supreme Court examined the legislative history and in Dickerson reversing the claims court, which had said this is merely a restriction on funding, the Supreme Court said no, we can tell in context and from the legislative history that Congress was in fact suspending the military re-enlistment bonus for the fiscal years at issue. It was not just a an accounting restriction. And just to address the or any other act language, that language it perfect sense in the Dickerson context because the proviso, the rider, that suspended the military re-enlistment bonus was appended to appropriations legislation for the Rural Electrification Administration, you know which is obviously not the only or primary source of military re-enlistment funding. And so Congress said no funds from this act or any other act can be used to pay the to that language. It's certainly not a reference to the Judgment Fund, which didn't even exist at the time of Dickerson. In Will, the Supreme Court walks through four different years of appropriations legislation. Year four did not have the any other act language and that had absolutely no significance for the Supreme Court. The question, and again in Will as in Dickerson, the Supreme Court looked at the legislative history and said we can tell Congress meant to the prior cost of living increases for judges salaries, not merely to consign them to fiscal limbo. So it brings us back to what Judge Brueging said in the main community health options case, which is that Congress was presented by GAO with two potential pools of money from which risk corridors payments could be in. And that is the end of the matter because Congress has plenary control over the appropriations process and Congress thereby capped payments out at the total amounts collected as payments in. Any further discussion of the contract? On contract, again to be precise, I think Lincoln's Council correctly conceded that section 1342 does not create a contract. Well, Mota may not concede that, although I believe Mota also does not suggest that the language of 1342 has any indicia of binding Congress and contract. I understood the argument to be is you take everything in totality, you take the regulations and the statutory language. So I'll move on, but first you know we we disagree insofar as Congress did not choose to create risk corridors contracts, nor did it give HHS authority to enter into risk corridors contracts. But in any event, if you pull up the HHS regulations, the various statements in the Federal Register, none uses the language of contract. There are no risk corridors contracts. The QHP agreements that were referred to have to do with data security and privacy. They have nothing to do with risk corridors. So even if HHS thought there was an obligation to pay out, that it wasn't a contractual obligation, in their view it was at best a statutory obligation? Exactly. And then going back to the central point made by Judge Brugink is Congress has untethered power to modify a statutory obligation. So even assuming, for the sake of argument, that there ever were such an obligation, Congress got rid of it in 2014, 2015, 2016, when it repeatedly enacted appropriations legislation that appropriated monies in, but explicitly barred HHS from using the only other funding source available. And just a little bit of technical cleanup, there I think was some confusion about user fees. What GAO said correctly is to the extent insurers make payments in pursuant to 1342, and those payments are then used to make payments out under 1342, they meet the definition of a user fee. So those payments in from insurers when they started coming in, in 2015, 2016, 2017, could be used to make payments out. There are other unrelated user fees and no one has ever suggested that those monies could be used to make risk corridors payments out. That's just a misunderstanding of what GAO said. And to the extent that Judge Wheeler, in the Mota opinion that we retreated from this in Molina, had suggested that monies from 2014 could have been used to make risk corridors payments in 2014, again that's chronologically makes no sense. There could not be any risk corridors payments until 2015 by statute, just because the GAO was just addressing a counterfactual saying, Congress, if you reenacted the same language from the fiscal year 2014 Appropriations Act in subsequent years, that will allow HHS to use payments in to make payments out, potentially to use the lump sum, except that Congress extinguished the any access to the lump sum. Was HHS innocent of the shortfalls that were occurring when they enacted the later legislation which said that it's going to be limited to what comes in, in terms of what goes out, and that that was not an amendment of the prior legislation, what you called a technical clean-up? No, the technical clean-up was just on certain lingering points. We're saying, even if you assume that when Congress passed the Affordable Care Act, it intended to appropriate taxpayer funds to make sure there were no shortfalls, it doesn't matter because Congress clearly and deliberately in 2014, 2015, 2016 enacted legislation that made payments in the sole source of funding. You're saying that it doesn't matter is what I heard you say, the initial legislation. The initial legislation doesn't matter. It is also true that the initial legislation did not appropriate any money for risk corridors payments, did not authorize appropriations, and did not... Well, let's assume we think it was kind of a clear authorization. Your position remains, though, that under the case law, even if it was a clear authorization, Congress can repeal, amend, or suspend a prior authorization. Exactly. No, it's exactly the point Judge Brugink made. It directly follows from Dickerson, Will, and also Highland Falls, where this court inferred from an earmark alone an intent to modify an earlier spending formula, and so yes, basically Congress's intent in enacting the appropriations legislation and repeatedly reenacting it is dispositive. There are no magic words required, and Congress's intent was abundantly clear here. May it please the court, Stephen Rosenbaum from Moda Health. I want to take the issue sequentially, starting with 1342. Did it make a promise, an enforceable promise, an enforceable statutory promise? We believe the answer is clearly yes, and let me start by saying everyone whose opinion ought to matter agrees with us. By that I mean the agency itself, CMS, said in 2012, before we had decided to join the program, explicitly, and I quote, the Risk Corridors Program is not statutorily required to be budget neutral. Regardless of the balance of payments and receipts, HHS will remit payments as required. GAO is on our side on the issue, too. You only have 15 minutes, you're free to use them however you want, but you probably ought not to start with your strongest argument, you probably ought to start with your weaker one, as long as you've heard us question the other side about this next step. And so I go then to your particular discussion of the language of the various provisions in the Act. We regard the promise made as to Risk Corridors to be the strongest of all. There is no limitation whatsoever imposed on the shall pay obligation. With respect to some of the things the government was doing, they put a specific appropriations cap. We only spent X amount of money. That was not done with respect to Risk Corridors. Let me go with that. If we assume, as we believe is clearly the case, that that obligation is there, let's go to the appropriations riders. Our view is that this case is controlled by the language of Gibney, because the language of Gibney is exactly the same as the language in the appropriations riders here. In Gibney, this court faced language that said, quote, none of the funds appropriated for the Immigration and Natural Relation Service shall be used to pay compensation for overtime services other than is provided in two general statutes, thereby excluding the statute under which the claim was being made. This court held, this court's predecessor held, that language was not sufficient to vitiate the statutory promise made in the other statute. The language at issue here is exactly the same. None of the funds made available by this act from various sources may be used for payments under Risk Corridors. What about Will? It seems like the language is similar to Will, and the difference, the distinction I think you make in your brief with respect to Will is only that it said, or other statutes. Will said many things, because there were different provisions and different sequential statutes, but they were all interpreted by the court as things that ought to be read together. They specifically said that the pre-existing statutory obligation, quote, shall not take effect. They vitiated the pre-existing statutory obligation explicitly. That obligation, quote, shall not take effect. And they said... But you agree, do you not, that the riders could still trump the statute, even if the statute is left in effect, that Congress could, through appropriation, say we're just not appropriating any money to fund that authorization. They could vitiate a statutory obligation, not a contractual obligation, such that we believe... Okay, but before you move to the contractual stuff, but with respect to the statutory obligation... And the question is whether the language here meets the clearly manifest test that the Supreme Court established in TVA, and as this court held in Gibney, the specific language used simply is not enough. Am I wrong, I mentioned, I asked your friend on the other side, the language that I took out of some of the early Supreme Court cases is expressly or by clear implication. Do you disagree with that being the standard? I know obviously there's a lot of... Well, I think the Supreme Court in TVA said clearly manifest, and we think that's the appropriate test. And we, and we, and it's important to recognize that in Gibney, this court looked at legislative history that might well have indicated Congress hoped to both the majority and the concurrence made absolutely explicit. That's not the test. The test is whether the statute has the language that makes it clear, and what this court said in Gibney was we, quote, know of no case in which any of the courts have held that a simple limitation of an appropriations bill on the use of funds has been held to suspend a statutory obligation, end quote. That's still good law. In Will, the language talked about that the pre-existing statutory obligation shall not take effect. In Dickerson, the court said that the statutory obligation, quote, is hereby suspended. The statutory obligation is hereby suspended. In Highland Falls, the Department of Justice is wrong to rely upon Highland Falls at all, because Highland Falls was not a money-mandating statute to begin with, so the court was not grappling with the question. In Gibney's 1949 case, that's what I was looking for to figure out what year it was, 1949, there are many cases that have occurred since then, including in 1980, the United States v. Will, which have the expressly and by clear implication language in it, and that's a Supreme Court decision. So you've got this Court of Claims decision from 1949. Are you now telling me whatever standard was articulated in that trumps the later Supreme Court decision? No, I think the standards are all consistent, and I was, the manifest test standard that I'm quoting from, that's a Supreme Court test. I want to be clear, she asked whether you agree that the test included the language expressly or by clear implication, and I thought your answer to her was clearly no. No, if I said that, I overstated it. What my point here is, is that the language used is not sufficient to meet the standard that has been consistently applied when looking at these questions. In Highland Falls, the question was not presented because it was not a money-managing statute. Now, the government in the reply brief says, quote, although plaintiffs assert that the statute at issue in Highland Falls was not money-managing, this Court said no such thing. That is inconsistent with what the Department of Justice told this Court when it was briefing Highland Falls, when it said, quote, as the Court of Federal Claims found, and as appellants evidently concede on this appeal, the impact aid program, that's what was at issue in Highland Falls, is a discretionary spending program, not a mandatory spending program. Well, if it's not a mandatory spending program, then all of these, then it's a completely different analysis. But here, it is a mandatory spending program. The shall pay language is what this Court has held is clearly sufficient to establish a mandatory payment obligation. So you want to move on to your contract cases? Yes, Your Honor. The government relies principally on two cases that are not breach of contract cases, but due process cases. One of them involved an agreement, the Amtrak case, where the Court found that the government retained power to act as regulator with respect to contracts between railroads and Amtrak. Amtrak is not a governmental entity, so we were not dealing with the government's own contracts. And so the Court understandably held that if we weren't dealing with the government's own contracts, the government retained its normal regulatory powers. But when you look at the cases of this Court that deal specifically, or other courts that deal specifically with breach of contract claims, we think the indicia are here that were sufficient to find contracts in those cases. Radium mines is an example where the Court said that if the government in regulation and statute said, if you mine uranium, we will buy it for price X. Yeah, and that was clearly much more of a guarantee and offer through the regulations. It was contemplated a direct exchange of uranium to the government for money. That's a lot more specific in terms of a contract case than what's going on here. Well, Your Honor, I think it is a contract case here in the sense that we were being, insurers had no obligation to participate in the Affordable Care Act program. They had no obligation to provide qualified health plans. They were being told, if you agree to provide qualified health plans, to take on these obligations, to provide the insurance coverage for these people, we will provide you certain things in return. So what is the source of the contract claim? Are you suggesting it's predominantly the statute? I think it's a combination. I think the statute, I think it's the regulation, which is even clearer than the statute perhaps, although the statute is clear enough to begin with, that the government will make those payments. I think it's the statements made in the preamble where they made explicit that the payments would be made regardless of whether payments in were sufficient to make them. I think it's the adjustments that were made once it was certain potential enrollees were no longer going to have to enroll that the government stepped in and made adjustments to the risk order program to address that. I think it's the totality of those conditions that are sufficient to create a contract. But even in your brief, you point out, and you say it has no legal consequence, but you point out and acknowledge, which I appreciate, that when Congress enacted this, presumably everybody, nobody in the world thought this was going to result in heavy payments owed by the government. They thought it would end up being kind of neutral with pay in and pay out. And it was really predominantly this transition policy that occurred later, not through statute, but through the agency, that kind of threw this all in a tailspin. So if that's the history and that's the context in which we were all operating, why shouldn't that be probative of whether there was a contract here? Well, I think because the contract was one that promised us these risk order payments, regardless of what events would trigger those payments having to be made, the CBO may have initially estimated, to use their term of art, that it would be roughly budget neutral. But the CBO made explicit that that was not a requirement. And so from our perspective, whether someone in the government was hoping that it was going to be budget neutral or not was perhaps interesting, but had nothing to do with what promise had been made. The promise that had been made was made with clarity that these payments shall be made. And we therefore relied upon that going forward, as contractual parties do. I would mention Judge Brugink did not have a contract claim before him, so he never addressed this issue. But here it is addressed clearly. And we do see that the necessary elements are all present for there to be a contract. The case law is clear that authority to enter into a contract is assumed if it falls within the scope of what the powers are, general powers are, that have been provided to the agency in question. And here, the statute expressly gives the Secretary of HHS the power to administer the Affordable Care Act, to establish the exchanges, to establish a risk order program, and obviously these payment obligations are part of those risk order program obligations, and to make risk order payments. So all of those powers combined fall within what this court in the Landau case said was sufficient, namely authority to contract is implied when what's being done is an integral part of the duties assigned. And this court has applied that in many circumstances. In the Fifth Third Bank, the court said that there was a right to contractually obligate, to allow goodwill to be treated in a certain manner, because that was an essential tool for the program that was being carried out by the government. That's just one of many examples. But here, there was a mutuality of exchange, of intent, of benefits, going in both directions. These are all the critical indicia of an implied contract, and for those reasons, we think we do have a contract claim. And of course, if we do, the appropriations riders leave our rights unaffected, in the sense that we have the right to pursue our claims here, because government action, congressional action, that vitiates our contractual rights gives rise to a breach of contract claim. Now one of the cases today had a takings claim, and the other didn't. Was yours? Mine does not have a takings claim, no. We feel comfortable that we have an implied contract, we also feel comfortable we have statutory rights, and those are the claims that we pursued. Going back even to the Collins case in 1879, this court has enforced statutory obligations regardless of whether Congress made an appropriation with respect thereto. Well, that's true if there's silence or failure to appropriate, but you've got Mitchell and Fisher, which were early cases around the same time as Langston, where they acknowledged that there was a basis for repealing or suspending those authorization obligations. And we do not deny that from a statutory perspective, Congress has certain powers, but the question is what specificity is necessary for those powers to have been exercised. And there is nothing in Will or Dickerson or Highland Falls that suggests that Gibney has been modified, overturned, or anything else. And that is the statute that has the language that is clearly analogous to the language of the appropriations writers issued here. I'll be brief. On Gibney, we explained this in our brief, the appropriations legislation had an explicit carve-out that benefited the plaintiff in Gibney. It said no funds shall be paid essentially for overtime except in accordance with the Federal Employees Pay Act. And as the Gibney court itself explained, the Federal Employee Pay Act carved out the 1931 Act, which was the basis for Gibney's cause of action. So Gibney is completely unremarkable on its holding if there's dictum that's inconsistent with the later Supreme Court precedents. Of course, the Supreme Court precedents are controlling. The standard, as the court has noted, is just did Congress by clear implication limit spending to the amounts that were taken in. And for all the reasons described by Judge Brugink, Congress was at least as clear, if not clearer, in this context, in risk corridors, as Congress was in Dickerson, Will, and Highland Falls. Just to explain that sentence in Highland Falls from the government's brief that counsel quoted, the point was just that the statute in Highland Falls was discretionary spending in the sense that annual appropriations were used to fund it, which was relevant in Highland Falls, as opposed to the type of program for which there's a permanent appropriation, you know, mandatory entitlement programs. Nothing in this court's opinion suggested that the court lacked jurisdiction, that there was no money mandating statute. The court affirmed the dismissal for failure to state a claim because earmarks in subsequent appropriations legislation superseded a 100% funding formula in the organic earlier legislation. Unless there are further questions, I'll rest my briefs. Thank you.